UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
00-CV-1683(JMR/FLN)

| | | |
|---|---|---|
| Jeffery M. Kuha<br><br>v.<br><br>City of Minnetonka, William Roth, Kevin Anderson, and Dennis Warosh | ) ) ) ) ) ) ) | ORDER |

This matter is before the Court on defendants' motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). For the reasons stated herein, defendants' motion is granted.

I. Background

Plaintiff, Jeffery M. Kuha, claims he was subjected to unconstitutional brutality when he was bitten by a police dog during the course of an arrest. Mr. Kuha seeks damages from the City of Minnetonka, and Police Officers William Roth, Kevin Anderson, and Dennis Warosh, in their official and individual capacities. Plaintiff claims defendants violated his civil rights under 42 U.S.C. § 1983. Plaintiff also brings state tort claims of assault and battery and negligence.

II. Facts

On the evening of September 22, 1999, plaintiff went to a bar with friends. According to plaintiff, he consumed between four to five beers. After leaving the bar, he went to a friend's house. Plaintiff claims he left his friend's home at approximately 1:00

FILED DEC 4 2001
RICHARD D. SLETTEN, CLERK
JUDGEMENT ENTERED DEC 4 2001
DEPUTY CLERK'S INITIALS ____

a.m., intending to drive home. Shortly after leaving, he drove his vehicle into a roadside curb, damaging the car and flattening a tire. Plaintiff walked back to his friend's house to get help. He and his friend changed the tire. The damaged tire was placed on the front seat of the car. Plaintiff then proceeded to drive home.

Plaintiff drove into the City of Minnetonka where, at approximately 5:39 a.m., he encountered Officer Roth, who was driving in the oncoming lane. After plaintiff failed to dim his lights when he approached the oncoming car, Officer Roth did a U-turn and pulled him over.

The traffic stop seemed routine, until Officer Roth was getting out of his squad car just after calling in the vehicle's license plate information. At that time, plaintiff opened his car door, got out, looked at the officer, and ran from his car. Officer Roth attempted to follow plaintiff through a swampy area, but plaintiff disappeared. Officer Roth then called for help. A helicopter and a K-9 unit were dispatched to help him locate, apprehend, and secure the suspect.

While waiting for back-up, Officer Roth returned to Kuha's vehicle, noted its damage, and saw the damaged tire on the front seat, possibly indicative of a stolen vehicle.

Officers Warosh and Anderson arrived to provide backup shortly after Officer Roth's call for assistance. They were accompanied by Officer Anderson's K-9 partner, "Arco," who was

dispatched to track Kuha. Officer Anderson held Arco on a leash as they tracked plaintiff to a grassy field. Arco was commanded to "bite and hold" when he found the suspect. They followed plaintiff's trail until they found him sitting in three-foot tall weeds. Plaintiff states he held his hands up as the officers approached, but they did not see him.

Arco was the first to find Mr. Kuha. When he did, he obeyed his "bite and hold" command, biting plaintiff in his upper leg. Officer Anderson then inspected the area around plaintiff to ensure he was unarmed prior to calling off the dog. While Anderson secured the area, plaintiff gripped Arco's head trying to free his hold. Officer Anderson told plaintiff he would not countermand Arco's command until he let go of the dog and put his hands up. Plaintiff eventually complied. It is not disputed that the entire apprehension took approximately 10-15 seconds.

The officers then handcuffed plaintiff and observed blood where Arco applied his hold. The officers applied pressure to the wound and called for an ambulance. A subsequent medical examination revealed that Arco's bite had pierced plaintiff's femoral artery, causing substantial blood loss. On May 25, 2000, plaintiff pled guilty to the charge of disobeying a police officer.

According to plaintiff, he ran from Officer Roth because he feared he may have been over the legal alcohol consumption limit. Mr. Kuha claims he was afraid of being convicted for driving under

the influence which would severely hinder his prospects for a career as a commercial pilot. A sample of Mr. Kuha's blood was taken at the hospital when he was treated for the dog bite. The sample revealed Mr. Kuha's blood alcohol level exceeded the legal limit. He was not charged with driving under the influence, however, because of concerns that his blood loss may have altered the results of the blood alcohol test.

## II. Discussion

### A. Issues

Defendants' motion for summary judgment presents four issues:

1. Whether plaintiff's amended complaint asserts individual capacity claims against the officers?[1]

2. Whether plaintiff asserts a proper claim against the City of Minnetonka pursuant to 42 U.S.C. § 1983?

3. Whether the police officers are entitled to federal qualified immunity?

4. Whether the defendants are cloaked in official immunity against state tort claims of negligence and assault and battery?

---

[1]At oral argument, defendants conceded this issue, acknowledging that plaintiff's amended complaint properly asserts individual capacity claims against the police officer defendants.

B. Standard for Summary Judgment

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Anderson, at 248-49; see also Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Liberty Lobby, Inc., 477 U.S. at 247-48. If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. See Celotex, 477 U.S. at 322. Here, plaintiff fails to meet these requirements; accordingly, defendants' motion for summary judgment is granted.

C. Civil Rights Claim Against the City of Minnetonka

To hold the City of Minnetonka liable for a § 1983 brutality claim, plaintiff must establish that: (1) his apprehension by Arco was unconstitutional; and (2) his injuries were the result of the

City's custom or policy. Monell v. Department of Soc. Serv., 436 U.S. 658, 691-695 (1978). Plaintiff claims the K-9 "bite and hold" technique is an excessive use of force, and that allowing such a technique is tantamount to the municipality adopting a policy allowing excessive force.

1. Excessive Force

The United States Supreme Court has established that, when considering claims brought under 42 U.S.C. § 1983, "all claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989). In order to decide what is reasonable, a court must balance the intrusion on the individual against the countervailing governmental interests. An objective reasonableness test requires the court to look closely at the facts and circumstances in each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. See also Tennessee v. Garner, 471 U.S. 1, 8-9 (1985).

Plaintiff claims the use of the K-9 in this case was excessive force, because the bite occurred within the context of a routine traffic stop. Plaintiff is incorrect. While the traffic stop may

have appeared to be routine at first, it escalated beyond the ordinary when the plaintiff bolted from his car. Once Officer Roth knew plaintiff ran from the scene and observed the tire on the front seat of the car, he could properly consider that plaintiff may have been involved in serious misconduct. Officer Roth's call for help and Arco's assistance was fully justified as part of his efforts to apprehend plaintiff.[2]

The use of a police dog to apprehend a felony suspect is not deadly force or excessive force. See Matthews v. Jones, 35 F.3d 1046, 1051 (6th Cir. 1994); see Robinette v. Barnes, 854 F.2d 909, 913 (6th Cir. 1988). In particular, the use of a police dog trained in the "bite and hold" technique is not excessive force where the officers did not know the nature or extent of the activities of the suspect or whether he was armed. Matthews, 35 F.3d at 1052. The use of a properly trained police dog does not carry with it "a substantial risk of causing death or serious bodily harm." Robinette, 854 F.2d at 912. An action may lie if the record shows the dog had improper training which resulted from

---

[2]Plaintiff makes much of the fact that the officers used a dog to apprehend "an unarmed man." The argument is spurious. While there is no question Officer Roth did not see a gun when he initially stopped Kuha, this does not at all establish that Officer Roth knew Kuha was unarmed. When Kuha fled into the night, the officer reasonably regarded the fleeing suspect as highly dangerous to himself and quite possibly to others. The Court considers Officer Roth to have been completely reasonable in assuming the suspect to be potentially dangerous -- until Mr. Kuha was under control and positively shown to be unarmed.

something more than negligence. Matthews, 35 F.3d at 1051; Robinette, 854 F.2d at 912. This circumstance is not present here.

Plaintiff does not question that Arco was properly trained under the "bite and hold" standards; rather, he contends the dog should have been trained in the "find and bark" method instead. Plaintiff does not, however, proffer any law holding the "bite and hold" method unconstitutional or illegal. Similarly, he has provided no evidence showing Arco to be violent or unnecessarily aggressive.

The Sixth Circuit's decision in Matthews addressed the issue of excessive force. That case involved a traffic stop for speeding and reckless driving. Matthews, 35 F.3d at 1048. The driver had been drinking and was driving on a suspended license. He was pulled over and fled. An officer with a K-9 was called to assist with the search. The dog was trained in the "bite and hold" method, and utilized it when the suspect was found. The Court held that the use of the dog for the traffic stop was not excessive force, and found the officer had legally sufficient grounds to stop the driver. Id. at 1051. The Court stated:

> Matthews was obviously fleeing in an attempt to evade the police; the area into which he fled in the darkness provided a strategic advantage to Matthews in that he could easily ambush the officers; and Matthew's extreme behavior provided cause for the officers to believe he was involved in behavior considerably more nefarious than mere traffic violations. . . . [A] reasonable police officer . . . would have believed Mathews posed a threat to the officers' safety as well as others. Id.

Here, the use of the K-9 "bite and hold" method to apprehend plaintiff was not excessive force. The officers' actions were not unreasonable; therefore, there was no unconstitutional use of excessive force.

2. Municipal Liability from a Custom or Policy

The Court's finding that the use of Arco's "bite and hold" technique was not excessive force when used to apprehend plaintiff precludes a § 1983 claim against the City of Minnetonka for deprivation of federal rights under color of state law. Because the officer's actions were constitutional, plaintiff cannot maintain a valid constitutional claim against the city.

Even if the officers had been found to have violated plaintiff's rights -- and the Court does not so find -- the plaintiff still cannot show he sustained a colorable Monell claim. To succeed in a § 1983 claim, plaintiff must show that the City, through its deliberate conduct, is the "moving force" behind the injury. Board of Comm'r of Bryan County v. Brown, 520 U.S. 397, 404 (1997). Plaintiff must do more than merely identify the offending policy; he must show the City has the requisite degree of culpability, and demonstrate a direct causal link between the municipality's action and the deprivation of federal rights. Id. Under limited circumstances, inadequate training can support a § 1983 claim. Id. at 407.

Plaintiff first claims the municipality's use of the K-9 "bite and hold" technique is unconstitutional. Plaintiff next claims the "unwritten" "bite and hold" policy is the result of improper training by the City, and is not an isolated incident.

The use of the "bite and hold" method is not unconstitutional per se. Previous cases have found municipal policies which allow police dogs to "bite and hold" to be constitutional. See Robinette, 854 F.2d at 913; see Matthews, 35 F.3d at 1051. While neither case arose in the Eighth Circuit, this Court sees no reason to assume this Circuit would make a contrary decision.

When a policy is not per se unconstitutional, a plaintiff must demonstrate improper training. Here, plaintiff has not met this burden. Arco went through extensive, certified training, as shown by the monthly police logs. [Exhibits C, D, E, F, G, H and I.] Such training is consistent with that used by many other governmental entities, as certified by the United States Police Canine Association.

Under these circumstances, plaintiff has failed to present a triable case on the question of Monell municipal liability; accordingly, summary judgment is granted in favor of the City of Minnetonka.

E. Qualified Immunity

Qualified immunity is afforded to an officer if his or her actions do not violate "clearly established statutory or

constitutional rights which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As stated above, the Court finds the officers' actions in this case were reasonable and in accord with the Constitution. There is no basis on which to find the defendants' actions unconstitutional. Even if this were not so, the Court finds the officers' actions did not violate clearly established law.

1. Clearly Established Law

The determination of what law is clearly established is a "purely legal question." The Court considers the specific conduct complained of, and looks to statutory and case precedent and well-established general principles of law. J.H.H. v. O'Hara, 878 F.2d 240, 243 (8th Cir. 1989), cert. denied, 493 U.S. 1072 (1990) [citing Davis v. Scherer, 468 U.S. 183 (1984) (Brennan, J., concurring)]. This is because, "[i]f the law at the time is not clearly established, an officer could not reasonably be expected to anticipate the subsequent legal developments nor could he or she be said to 'know' that the law forbade conduct not previously identified as unlawful." Id. at 818. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in light of the pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Plaintiff claims it is clearly established that the use of police dogs which "bite and hold" without a verbal warning constitutes an objectively unreasonable seizure in violation of the Fourth Amendment. Plaintiff claims the Ninth Circuit adopted this view in Vathekan v. Prince George's County, 154 F.3d 179 (4th Cir. 1998) (involving the release of an unrestrained K-9 into a hole where the plaintiff was sleeping). The Court does not agreed. This case is plainly distinguishable from Vathekan. Here, the officers searched uncertain terrain in the swampy darkness in pursuit of a fleeing individual.

The Court declines to adopt the rule advocated by the plaintiff, which would require an officer in pursuit of a fleeing and hidden individual to announce his or her presence before using an instrumentality - here a trained police dog - to assure the officer's safety. Such a rule would place the officer in greater danger in a situation where the suspect, who has pre-selected his own hiding place, already has the upper hand.

This case presents no basis upon which the Minnetonka police officers could consider their use of Arco to be unconstitutional. Neither the Eighth Circuit, nor any other Court, has held the K-9 "bite and hold" technique to be an illegal seizure under the Fourth Amendment. Indeed, a number of courts have found the technique constitutional. See Matthew v. Jones, 35 F.3d 1046 (6th Cir. 1994) (finding there was no excessive force in the use of the "bite and

hold" method to apprehend a suspect fleeing from a traffic stop); Robinette v. Barnes, 854 F.2d 909 (6th Cir. 1988) (holding the use of the "bite and hold" method was not deadly force when apprehending a burglary suspect hiding in a building); Vera Cruz v. City of Escondido, 139 F.3d 659, (9th Cir. 1997) as amended on denial of rehearing and rehearing en banc, cert. denied, 525 U.S. 869 (1998) (finding "bite and hold" did not constitute the use of deadly force when apprehending a fleeing suspect).

In light of this history, there is no "clearly established law" holding the "bite and hold" method unconstitutional. The circumstances of this case have been held to be constitutional, and no reasonable officer would believe that he was violating the plaintiff's rights.

2. Reasonableness of the Officers' Actions

This part of the qualified immunity test requires the Court to apply a reasonableness test viewed from the perspective of a reasonable officer at the scene. Graham v. Conner, 490 U.S. 386 (1989). Reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving." Id. at 397-98. If officers of reasonable competence could disagree on the issue of reasonableness, then immunity should be granted. Malley v. Briggs, 475 U.S. 335, 341 (1986).

Plaintiff claims the officers' actions were unreasonable, in that using a K-9 was excessive in the context of a routine traffic stop. He may be correct in this assertion, although in light of Matthew v. Jones, 35 F.3d 1046, the issue is certainly problematic. Plaintiff's problem, however, is that his proposition is contrary to the facts in this case. As noted above, this traffic stop was anything but routine. This conclusion renders his argument specious, and the Court rejects it.

F. Official Immunity for the State Tort Claims

Minnesota's official immunity doctrine holds that "a public official charged by law with duties which call for the exercise of judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. Rice County, N.W.2d 671, 677 (Minn. 1988) (quoting Sulsa v. State, 274 N.W.2d 912 (Minn. 1976)). To apply the doctrine, the Court must determine if the officer's duties were discretionary. In making this determination the Court keeps in mind that official immunity, "protects public officials from the fear of personal liability that might deter independent action and impair the effective performance of their duties." Id. at 678. An official is not entitled to official immunity when he or she acted with malice. Pletan v. Gaines, 494 N.W.2d 38, 42 (Minn. 1992).

A police officer who performs his or her duty to prevent crime and enforce the law is not generally acting in a ministerial

capacity, but is usually exercising discretion. Elwood, 423 N.W.2d at 678. Generally, police officers acting in emergency situations are required to exercise a significant amount of independent judgment. Police officers are afforded this discretion to prevent hindrance of action in times of emergency. Id.

> Official immunity is provided because the community cannot expect police officers to do their duty and then to second-guess them when they attempt to conscientiously do it. To expose police officers to civil liability whenever a third person might be injured would . . . tend to exchange prudent caution for timidity in the already difficult job. Pletan, 494 N.W.2d at 41.

Whether an officer is entitled to official immunity involves a specific fact analysis. Elwood, 423 N.W.2d at 678.

Plaintiff claims the officers' actions in this case were ministerial, because once he fled, the City's policy required the use of K-9 force. Plaintiff is mistaken. The officers were not simply performing ministerial duties. The plaintiff's actions in bolting from his car and his escape into the night forced the officers to make split-second decisions which are the antithesis of ministerial actions. The officers could not know, and had to be prudently suspicious, of the risk or degree of danger plaintiff posed to themselves and the general public. The officers second-by-second decisions were, as a matter of law, discretionary determinations. Plaintiff's brief admits the officer had to choose the extent of force they would use to pursue and apprehend him. This case involves those same discretionary acts.

An official loses immunity when he or she is shown to have acted with malice. Pletan, 494 N.W.2d at 42. Malice requires bad faith. Elwood, 423 N.W.2d at 679. Plaintiff claims the totality of the events themselves indicate bad faith. The Court rejects this formulation. Having failed to identify any specific evidence of malice, plaintiff cannot bootstrap his failures into an overall success. There is simply no evidence whatsoever of malice in this situation. The officers' immediate efforts to stanch plaintiff's bleeding and obtain medical assistance severely undercuts this argument. As a result, the officers are entitled to official immunity against the state tort claims.

The officers' immunity can also be accorded to the municipality. The City of Minnetonka may vicariously share the officers' immunity. Pletan, 494 N.W.2d at 42. Whether to apply vicarious official immunity is a policy question. The need to protect the public must be weighed against the concern that the public not be put at risk. Id. In this case, where the police officers exercised discretionary authority, the Court finds it proper to afford the City of Minnetonka vicarious official immunity.

III. Conclusion

Defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

Dated: December 3rd, 2001

JAMES M. ROSENBAUM
United States Chief District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd