00 cv-1683
JMR/FLN

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 02-1081

Jeffrey M. Kuha, *
*
Plaintiff - Appellant, *
*
v. * Appeal from the United States
* District Court for the District
City of Minnetonka; William Roth; * of Minnesota.
Kevin Anderson; Dennis Warosh; *
*
Defendants - Appellees. *
*

Submitted: October 7, 2002
Filed: May 8, 2003

Before MURPHY, JOHN R. GIBSON, and MELLOY, Circuit Judges.

MELLOY, Circuit Judge.

After fleeing a routine traffic stop in the early morning hours, the plaintiff-appellant, Jeffrey M. Kuha, was tracked to a grassy field by two police officers and a police dog. The dog, trained to bite and hold until commanded to release, bit Kuha near his groin, severing his femoral artery. Pursuant to 42 U.S.C. § 1983, Kuha

SCANNED
MAY 2 4 2004
U.S. DISTRICT COURT MPLS

brought an excessive force claim against the City of Minnetonka and several officers[1] involved in the incident. Kuha also brought state tort claims for negligence, assault, and battery. The district court granted summary judgment to the defendants, holding that Kuha could not demonstrate a constitutional violation and therefore could not state a claim under § 1983. The district court alternatively held that even if a constitutional violation could be established, the police officers had qualified immunity for their actions, and Kuha could not show that the violation was caused by inadequate training or a custom, practice or policy of the City. The state claims were dismissed under Minnesota's immunity doctrine. This appeal followed.

We reverse in part and affirm in part. We hold that Kuha's allegation that the police officers failed to give a verbal warning prior to using a police dog trained to bite and hold is sufficient to state a Fourth Amendment claim. Thus, we disagree with the district court's initial determination that Kuha failed to allege a constitutional violation. We also disagree with the district court's conclusion that the City is not liable under § 1983 as a matter of law. We agree, however, that the individual officers are shielded from suit by qualified immunity, and that the state claims were properly dismissed against all defendants.

I.

On the evening of September 22, 1999, Kuha went to a bar with friends. He states that he had four or five beers at the bar and then drove to a friend's house. Kuha claims he left his friend's home at approximately 1:00 a.m., intending to drive

[1] The caption names William Roth, Kevin Anderson, and Dennis Warosh as direct defendants. During summary judgment proceedings, Kuha voluntarily dismissed his action against Officer Roth. See Appellant brief, at 3 (citing transcript of summary judgment hearing, at 3).

home. Shortly after leaving, he drove his car into a roadside curb, damaging the car and flattening the tire. Kuha walked back to his friend's house to get help. He and his friend changed the tire and placed the damaged tire on the front seat of the car. Kuha then continued on his way home.

At approximately 5:30 a.m., Kuha encountered Officer Roth, a Minnetonka police officer, who was driving in the opposite direction. Kuha failed to dim his lights when he approached the oncoming police car. Officer Roth made a u-turn and pulled Kuha over. Officer Roth called in the vehicle's license plate information and started to get out of the car for what appeared to be a routine traffic stop.

At this point, Kuha opened his door, got out, looked at the officer, and ran from his car, heading for a ditch and swamp abutting the road. Officer Roth attempted to follow Kuha but Kuha disappeared into the swamp. Beyond the swamp was a hilly area with high grass and dense brush and foliage. Beyond that were apartment and office buildings. Officer Roth returned to his police car and called for back-up. While waiting for back-up, Officer Roth inspected Kuha's car, noting its damage and the flat tire on the front seat. He also found Kuha's wallet and concluded that the picture on the license matched that of the person who had fled from the scene.

Within minutes, Officers Warosh and Anderson arrived. They were accompanied by Officer Anderson's K-9 partner, "Arco." Arco is trained under a "bite and hold" method; thus, if given a "find" command, Arco will find, bite and "hold" a suspect until commanded to release. While tracking Kuha, Officer Anderson held Arco's leash in one hand and a flashlight in the other. Officer Warosh provided cover for the K-9 team. Arco remained on his leash as they tracked plaintiff up a steep, woody hill and toward a grassy field.

Approximately thirty minutes after the initial stop, and as the K-9 team reached the top of a hill, Arco alerted, indicating that plaintiff was relatively nearby. At this point, Arco was around ten feet out on his lead. Arco bounded into the three-foot-high grass and "seized" Kuha. Arco is trained to bite and hold the first body part that he reaches. In this instance, Arco bit Kuha's upper leg. Kuha was naked except for his boxer shorts. He claims that he took off his clothes after swimming through the swamp because they were wet and cold.

Kuha states that he held his hands up to surrender as the officers approached and before Arco bit him, but concedes that the officers may not have seen him because of the high grass. The officers aver that they did not see the seizure but instead heard Kuha scream and arrived on the scene immediately thereafter. Prior to calling off Arco, Officers Anderson and Warosh inspected the area around and under Kuha to ensure he was unarmed. During this time, Kuha gripped Arco's head trying to free his hold. Officer Anderson repeatedly told Kuha he would not call off the dog until Kuha let go of the dog and put his hands up. Kuha eventually complied and Officer Anderson called off the dog. It is undisputed that the entire apprehension, from bite to release, took no more than ten to fifteen seconds.

The officers then handcuffed Kuha and noticed that Kuha was bleeding from the site where Arco bit him. They applied pressure to the wound and called for an ambulance. A subsequent medical examination revealed that Arco's bite had pierced plaintiff's femoral artery, causing substantial blood loss.

On May 25, 2000, Kuha pled guilty to the charge of disobeying a police officer. According to Kuha, he ran from Officer Roth because he feared he may have been over the legal alcohol consumption limit. Kuha claims he was afraid of being convicted for driving under the influence which would have severely hindered his

prospects for a career as a commercial pilot. A sample of Kuha's blood was taken at the hospital when he was treated for the dog bite. The sample placed Kuha's blood alcohol level above the legal limit. He was not charged with driving under the influence, however, because of concerns that his blood loss may have altered the results of the test.

## II.

We review de novo the district court's grant of summary judgment and its qualified immunity determination. See Hill v. McKinley, 311 F.3d 899, 902 (8th Cir. 2002); Cooksey v. Boyer, 289 F.3d 513, 515 (8th Cir. 2002).

### A. Kuha's § 1983 claims:

"In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." Cooksey, 289 F.3d at 515 (citations omitted).

Kuha asserts that Officers Anderson and Warosh used excessive force in violation of the Fourth and Fourteenth Amendments in: (1) using a dog trained in the "bite and hold" method under the circumstances of the case – where Kuha had fled from a minor traffic violation and there was no legitimate concern that he was armed or dangerous; (2) allowing the dog to attack Kuha without warning; and (3) refusing to call off the dog when it was clear that Kuha was unarmed and not dangerous. Kuha alleges municipal liability based on the City's failure to properly formulate a

police dog policy that contemplates less dangerous methods–e.g., the "find and bark" method. Kuha also alleges municipal liability based on the City's inadequate training, control and supervision of its officers regarding the appropriate use of police dogs.

Kuha's excessive force claim is analyzed under the Fourth Amendment's "objective reasonableness" standard. See Graham v. Connor, 490 U.S. 386, 395 (1989) (clarifying that "*all* claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard") (emphasis in original). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979), quoted in Graham, 490 U.S. at 396. "[H]owever, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985), characterizing the inquiry as "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure"). In sum, "the nature and quality of the intrusion on the individual's Fourth Amendment interests [must be balanced] against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983), quoted in Garner, 471 U.S. at 8.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that

are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 396-97. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397 (citations omitted). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. (citations omitted).

In reviewing Kuha's claims, the substantive law must be applied in the context of a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Thus, the relevant inquiry is whether Kuha presented enough proof in support of his claim that a jury could properly find that the degree of force used against him was not "objectively reasonable." We conclude that he did.

Before reviewing Kuha's specific claims, we briefly address, and reject, Kuha's contention that a police dog constitutes deadly force.[2] No federal appeals court has held that a properly trained police dog is an instrument of deadly force, and several have expressly concluded otherwise. See, e.g., Vera Cruz v. City of Escondido, 139 F.3d 659, 663 (9th Cir. 1998) (defining "deadly force" as "that force which is reasonably likely to cause death" and finding the possibility of death from a properly trained police dog too remote to constitute deadly force); Robinette v. Barnes, 854 F.2d 909, 912 (6th Cir. 1988) (holding that "the use of a properly trained police dog

[2] Under Tennessee v. Garner, 471 U.S. 1 (1985), it is objectively unreasonable to use deadly force against a suspect "unless it is necessary to prevent [his] escape and the officer has probable cause to believe that the suspect poses a threat of death or serious physical injury to the officer or to others." Id. at 3. We assume without deciding that Garner's probable cause standard could not be satisfied in this case.

to apprehend a felony suspect does not carry with it a 'substantial risk of causing death or serious bodily harm'") (footnote omitted, and quoting definition of "deadly force" from Model Penal Code § 3.11(2)). In Robinette, the only published case where a suspect was actually killed by a police dog, a burglary suspect was hiding beneath a car and the police dog seized the suspect's exposed neck. Id. at 911. The Robinette court concluded that deadly force was not at issue because there was no showing that the unusual circumstances which resulted in the suspect's death were foreseeable. Id. at 912 (describing incident as "an extreme aberration from the outcome intended or expected").

"[T]he mere recognition that a law enforcement tool is dangerous does not suffice as proof that the tool is an instrument of deadly force." Id. at 913; see also Vera Cruz, 139 F.3d at 661 ("[W]e do not read Garner as covering all uses of force that might result in death, no matter how remote the possibility."). We find the likelihood of death from the use of a properly trained police dog to apprehend a suspect sufficiently remote as to preclude its characterization as deadly force.[3] See

---

[3] We acknowledge some conflict within the case law as to whether the Model Penal Code (MPC) definition of deadly force--"force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily injury," MPC § 3.11(2)–is appropriate for Fourth Amendment analysis. Compare Vera Cruz, 139 F.3d at 661-63 (discussing case law and finding the MPC definition inapposite to the Fourth Amendment context), with Robinette, 854 F.2d at 912-13 (applying MPC definition in context of police dog bite), and Ryder v. City of Topeka, 814 F.2d 1412, 1414 n.11 (10th Cir. 1987) (approving MPC definition in footnote and applying to police shooting). We find persuasive the reasoning espoused in Vera Cruz: "The MPC is designed to govern criminal liability; Garner's deadly force rule sets the boundaries of reasonable police conduct under the Fourth Amendment. We decline to put police doing their jobs in the same category as criminals doing theirs." Vera Cruz, 139 F.3d at 662. That said, under the MPC definition our ultimate conclusion remains unchanged: the use of a properly trained police dog in the course of apprehending a suspect does not constitute deadly force.

id. at 663 (assuming "that a properly trained police dog could kill a suspect under highly unusual circumstances," but concluding that "[t]he prospect of such an aberration doesn't convert otherwise nondeadly force into deadly force"). Accordingly, review of excessive force claims involving police dogs is properly governed by the general standard established in Graham rather than the deadly force standard of Garner.

Turning to Kuha's specific claims, we conclude that a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender. In Vathekan v. Prince George's County, 154 F.3d 173 (4th Cir. 1998), the Fourth Circuit reversed a summary judgment ruling in favor of a police officer who deployed a police dog without a verbal warning. Id. at 178-79; see also Kopf v. Wing, 942 F.2d 265, 268-69 (4th Cir. 1991) (reversing summary judgment in favor of officer defendants where there existed a factual dispute regarding whether a verbal warning was given, and recognizing validity of plaintiff's argument that "a forewarning that the dog is going to attack, which provides the suspects a fair chance to surrender, is more reasonable than a surprise assault"). While other circuits have not addressed this precise issue, the presence or absence of a warning is a critical fact in virtually every excessive force case involving a police dog. See, e.g., Ruvalcaba v. City of Los Angeles, 167 F.3d 514, 517 (9th Cir. 1999) (noting that officers gave three warnings in both Spanish and English before releasing police dog into a closed theater pursuant to burglary reports); Vera Cruz, 139 F.3d at 660-61 (9th Cir. 1997) (officer gave two verbal warnings before sending police dog after fleeing suspect, who was drunk and had been harassing restaurant employees); Matthews v. Jones, 35 F.3d 1046, 1051 (6th Cir. 1994) (finding no excessive force as a matter of law where the record was clear that the officer warned plaintiff, a fleeing misdemeanant, several times before releasing the police dog to apprehend him); Robinette, 854 F.2d at 911 (holding fatal attack on suspect by police dog objectively reasonable where undisputed testimony

showed that police shouted three warnings before releasing dog). See also IACP National Law Enforcement Policy Center: "Law Enforcement Canines," (May 1992), Appellant's app. at A.227 ("It is essential that a verbal warning be issued prior to releasing the canine . . . . The warning should be given from behind cover and in such a manner, if possible, that would allow anyone . . . to hear it. . . . [T]he warning should be repeated . . . and a reasonable time given for the suspect to surrender before the canine is released.").

The district court held that the officers were not required to put themselves in danger by giving away their location to a hiding suspect whom they did not know for certain was unarmed.[4] We agree that officer safety is paramount but disagree that requiring a verbal warning will put officers at increased risk. To the contrary, such a practice would likely diminish the risk of confrontation by increasing the likelihood that a suspect will surrender. See Robinette, 854 F.2d at 914 (concluding that use of police dogs reduces likelihood of harm to officers, bystanders and suspects). While there may be exceptional cases where a warning is not feasible, we see no reason why, in this case, the officers could not have placed themselves out of harm's way–e.g., at the top of the hill where they had a good vantage point, or behind one of the nearby apartment buildings–and given a loud verbal warning that a police dog was present and trained to seize by force. Although a verbal warning will not always result in a peaceful surrender, it may be, as argued by plaintiff, that, without such a warning, seizure by force is a nearly foregone conclusion. See Vathekan, 154 F.3d at 176 (noting that purpose of verbal warning is to "enable innocent persons to exit the area and afford suspects an opportunity to surrender").

---

[4] We note that the search in this case involved hiking through dense brush, foliage, and high grass, with flashlights and a police dog. Given this, we suspect that the officers' location was ascertainable without a warning, and, indeed, the record suggests that Kuha heard their approach prior to his seizure.

As to Kuha's other claims, we conclude that neither survives summary judgment. Kuha contends that the use of a police dog trained only in the bite and hold method was objectively unreasonable. In essence, Kuha argues that the governmental interest in apprehending a fleeing misdemeanant will never outweigh the potential harm inherent in canine assisted apprehensions. We disagree. Police dogs serve important law enforcement functions, see Robinette, 854 F.2d at 914 (declining to "label 'unreasonable' a police practice [dog use] which has proven useful in a variety of law enforcement situations"), and their use is not inherently dangerous. There are innumerable situations where the use of a properly trained and utilized police dog, even one trained only in the bite and hold technique, will not result in physical interaction with the suspect, most obviously because the dog remains on a leash until his handler releases him. Police are trained, and constitutionally obligated, to use only that amount of force reasonably necessary to effect a seizure. We will not presume that officers will abuse their discretion in this respect. And, as discussed above, we believe it will be the rare case where a verbal warning prior to releasing the dog would not facilitate a peaceful resolution of the situation. In sum, the mere use of a police dog trained to bite and hold does not rise to the level of a constitutional violation. Cf. Jarrett v. Town of Yarmouth, 309 F.3d 54, 63 (1st Cir. 2002) (discussing K-9 bite case law in context of qualified immunity, and observing that "there is no case that has held ["bite and hold"] policies to be unconstitutional"). And in this particular case, we agree that, given the odd turn of events initiated by Kuha, the initial decision to use Arco to assist in Kuha's apprehension was objectively reasonable as a matter of law.

Kuha's claim of excessive force by the officers in the moments following his apprehension by Arco is a closer question. We must decide whether, construing the facts in the light most favorable to Kuha, a jury could properly conclude that it was objectively unreasonable for the officers to require Kuha to release Arco prior to calling off the dog. Cf. Watkins v. City of Oakland, 145 F.3d 1087, 1090 (9th Cir.

1998) (affirming denial of qualified immunity where plaintiff raised genuine issue of material fact as to whether the force used against plaintiff, "including allowing [the K-9] to continue biting [him] until [he] showed his hands, was reasonable under the circumstances"). As Arco was biting Kuha's upper leg, Kuha's hands gripped the dog's head in an attempt to minimize the damage and pain. Officer Anderson repeatedly told Kuha that he would not call off the dog until Kuha raised his hands in the air. Kuha states that he tried to comply but his hands would instinctively return to the dog's head. Eventually Kuha did comply with Officer Anderson's order and the dog was called off. Kuha emphasizes that he was nearly naked during the attack, that he was clearly unarmed, and that the officers had no indication that he was dangerous.

Kuha's argument is compelling. It does not, however, end our analysis. Graham requires "careful attention to the facts and circumstances of each particular case," 490 U.S. at 396, and cautions against hindsight. Id. Here, the officers were confronted with an inexplicable flight from a minor traffic stop in the early hours of the morning. They knew the suspect had chosen to swim through a swamp rather than encounter a police officer. The area they were searching was difficult to traverse. The officers knew there were inhabited apartment buildings nearby and that residents would soon be leaving for work. They knew that Officer Roth had not seen a gun in the brief moments before Kuha fled, but, given the totality of the circumstances, they were reasonably wary of what they might encounter when they found Kuha, and reasonably concerned for their safety.

Turning to the actual seizure, it is undisputed that the entire incident lasted only ten to fifteen seconds. Moreover, we note that this is not a case where the officers are accused of siccing a police dog on a manifestly unarmed and compliant suspect. It appears uncontested that the officers did not see the initial seizure since Arco was ten feet ahead on his lead. They heard the scream and arrived immediately thereafter.

On arrival, the officers were confronted with Arco "holding" a nearly naked suspect who had been hiding in three-feet-high grass. During the ten seconds or so that ensued, the officers were searching the area under and around Kuha to ensure that he was not hiding a weapon which could be used against the officers or the dog. At the same time, Officer Anderson was ordering Kuha to release the dog's head.

In light of the short time frame at issue and the conditions under which Kuha fled and was found, we conclude that as a matter of law the officers' actions after Kuha was bitten were not objectively unreasonable. See Hill, 311 F.3d at 902 (stating that issue of whether the evidence establishes a constitutional violation is a question of law). We are mindful that we must construe the facts in the light most favorable to Kuha and we do so. But we cannot ignore the undisputed facts that are equally relevant to our analysis. To do otherwise would vitiate Graham's explicit recognition of, and allowance for, a measure of deference to officer judgment given the "tense, uncertain, and rapidly evolving" circumstances that officers often confront. Graham, 490 U.S. at 396-97.

B. Qualified immunity:

Because we find that Kuha made a sufficient showing to survive summary judgment on his § 1983 claim, we must review the officers' and City's asserted defenses. We agree with the district court that Officers Anderson and Warosh are entitled to qualified immunity for their actions in this case. Under the doctrine of qualified immunity, state actors are protected from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), quoted in Sexton v. Martin, 210 F.3d 905, 909 (8th Cir. 2000). The qualified immunity inquiry is a two-step process. First, the court must ask, "[t]aken in the light

most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If a violation can be made out, the next step is to ask whether the constitutional right was clearly established in light of the specific context of the case. Id. "For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Buckley v. Rogerson, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Kuha has alleged facts sufficient to establish a Fourth Amendment violation based on the officers' failure to give a verbal warning prior to using a police dog to seize him. The second step of the qualified immunity inquiry will still shield the officers from suit, however, if their conduct was objectively legally reasonable in light of the information they possessed at the time of the alleged violation. See Harlow, 457 U.S. at 818-19. In other words, if the officers' mistake as to what conduct the law required is reasonable, they are entitled to the immunity defense. Saucier, 533 U.S. at 205. Defendants will not be immune, however, "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded' that the defendant should have taken the disputed action." Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Thus, "[q]ualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier, 533 U.S. at 206 (internal citations omitted).

Kuha's right to a verbal warning in this case was not clearly established at the time of the seizure. Officers Anderson and Warosh were not on notice that it was constitutionally impermissible to use a police dog against Kuha without a verbal warning under the circumstances of this case. See Hill, 311 F.3d at 904 (quoting

Saucier, 533 U.S. at 201, for the proposition that "whether the alleged constitutional right was clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition'"); Jarrett, 309 F.3d at 62 (characterizing relevant inquiry as "whether a reasonable officer would have believed that releasing a trained police dog to apprehend [defendant] was lawful in light of both clearly established law and the particular circumstances of that night"). There are no cases from this circuit that mandate such a warning and a review of other circuits offers little guidance on the issue. In most of the published K-9 bite cases, the fighting issue is whether the initial decision to release the dog was objectively reasonable under the circumstances.[5] Where a verbal warning was given, the subsequent release of the dog to locate a hiding suspect has generally met that test. It does not necessarily follow, however, that it was clearly established that the absence of a verbal warning was objectively unreasonable.

In those few cases turning on a failure to warn, significant factual differences weigh against charging Officers Anderson and Warosh with notice sufficient to warrant denial of qualified immunity. The Fourth Circuit, in a 1998 case, found it clearly established that it is objectively unreasonable for a police officer to fail to give a verbal warning before releasing a police dog to seize someone. Vathekan, 154 F.3d at 175. Vathekan involved the release of a police dog into a house whereafter the dog

[5] Many of these cases involve allegations that an officer ordered a police dog to attack even though the plaintiff had clearly and unambiguously surrendered. See, e.g., Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000) (affirming denial of qualified immunity where plaintiff claimed to have complied with officer's command to lie down, but then officer ordered the dog to attack him anyway); Luce v. Hayden, 598 F. Supp. 1101 (D. Me. 1984) (denying summary judgment and qualified immunity to defendants where arrestee alleged that while he was lying on his back with his hands handcuffed behind him, the trooper had the dog bite the arrestee multiple times). This case includes no such allegation and thus these cases add little to our qualified immunity analysis.

found, bit, and seriously injured a sleeping woman. Id. In an earlier Fourth Circuit case, Kopf v. Wing, 942 F.2d 265 (4th Cir. 1991), the court concluded that releasing a police dog, without warning, into an extremely narrow passage between a shed and a fence, where the suspects were essentially trapped, could be deemed objectively unreasonable. Id. at 268-69. While we agree with the general holding in both these cases, they do not clearly establish that a verbal warning is always required. An officer could conclude, as Officer Anderson testified in this case, that in situations where the location of the suspect is less evident, a warning would place the officers at undue risk from a hiding suspect. As discussed, we disagree with this premise but cannot say that "no reasonably competent officer" would have concluded otherwise. See Malley, 475 U.S. at 341 ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). Accordingly, because Officer Anderson's mistake as to what the law required was reasonable, he and Officer Warosh are entitled to qualified immunity for their actions in this case.

C. The City's liability:

We turn next to the City's liability. A city may be sued directly under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the city's] officers." Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978). Monell liability also attaches "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Id. at 690-91. Municipalities cannot be held liable under § 1983, however, "unless action pursuant to official municipal policy of some nature caused a constitutional tort." Id. at 691. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor–or in

other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id.

In this case, Kuha argues that his injuries are the result of the City's unconstitutional policy regarding the use of K-9 force –i.e., that the City violated his Fourth Amendment right to be free from excessive force by adopting and implementing a policy of training and using police dogs in an objectively unreasonable manner. Applying the principles set forth in Monell, it is clear that the City's motion for summary judgment must be denied. Chief of Police Joy Rikala testified in deposition that everything that transpired in the apprehension of Kuha was in accordance with Department policy. Rikala dep. at 77; see also id. at 102 ("Q. You're fully satisfied that in all of the respects of [Officer] Anderson's behavior and his use of the K-9[,] Minnetonka's policy was carried out appropriately? A. Yes."). Thus, the fact that the Department's directive on police dog use may arguably be construed to require verbal warnings is insufficient for summary judgment purposes to shield Minnetonka from suit.[6] Chief Rikala's ratification of the officers' conduct also undermines her attempt to distinguish between training procedures, by which the dogs are trained to bite and hold *all* suspects, and official policy, which condones K-9 use in only limited circumstances. See Directive No. 50.1.3: Using Canine for Apprehension of Criminals (authorizing K-9 use in the following situations: to prevent continued criminal activity or escape of a person "whom the officer has

---

[6] The Department's Directive No. 50 touches on verbal warnings but in a limited way. Section 50.1.1 states: "The canine handler gives a verbal warning before entering a building and on each successive floor to search." It is unclear whether this verbal warning requirement extends to the situation here–where a K-9 is used outdoors. The City may argue at trial that it does, and that the City is not liable for officer conduct which conflicted with the policy. We note for summary judgment purposes, however, that Chief Rikala's ratification of all aspects of the officers' conduct undermines the City's argument on this point.

reasonable cause to believe has committed a felony or gross misdemeanor crime;" protection of an officer or other person from bodily harm; or "other tactical use").

We have already held that a jury could properly find that the failure to give a verbal warning before using a police dog trained to bite and hold is objectively unreasonable. If, at trial, the jury determines that a Fourth Amendment violation occurred in this case, then the jury can also reasonably conclude that the City's policy on police dogs–which authorizes the use of dogs trained only to bite and hold, and which did not mandate a verbal warning in this scenario–caused the constitutional violation. See Monell, 436 U.S. at 694 (explaining that city policy "causes" an injury where it is "the moving force" behind the constitutional violation). Accordingly, Kuha is entitled to maintain his Monell action. See Chew v. Gates, 27 F.3d 1432, 1444-45 (8th Cir. 1994) (reversing summary judgment in city's favor where there was "little doubt that a trier of fact could find that [plaintiff's dog bite] injury was caused by city policy" where departmental policy "authorized seizure of *all* concealed suspects–resistant or nonresistant, armed or unarmed, violent or nonviolent–by dogs trained to bite hard and hold") (emphasis in original).

D. The state tort claims:

The district court correctly granted summary judgment on the plaintiffs' state tort claims. See Kari v. City of Maplewood, 582 N.W.2d 921, 923 (Minn. 1998) (noting that application of immunity is a question of law subject to de novo review). Minnesota's official immunity doctrine provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. Rice County, 423 N.W.2d 671, 677 (Min. 1988)

(quotation and citation omitted);[7] accord Kari, 582 N.W.2d at 923. The doctrine is "intended to insure that the threat of potential liability does not unduly inhibit the exercise of discretion required of public officers in the discharge of their duties." Watson v. Metro. Transit Comm'n, 553 N.W.2d 406, 414 (Minn. 1996) (quotation omitted). "Official immunity involves the kind of discretion which is exercised on an operational rather than a policymaking level, and it requires something more than the performance of 'ministerial' duties." Pletan v. Gaines, 494 N.W.2d 38, 40 (Minn. 1992).

On appeal, Kuha argues that the officers' actions were ministerial rather than discretionary and thus official immunity is inapplicable.[8] Kuha's theory posits that once the police made the decision to use a police dog to apprehend him, the assault and battery–i.e., the dog bite–was inevitable and no discretionary decisions were involved. See Watson, 553 N.W.2d at 411 ("A court reviewing immunity issues must examine with particularity the nature of the conduct the plaintiff alleges as the basis of a negligence claim.").

For reasons already discussed, we reject the contention that the use of a properly trained police dog inevitably results in apprehension by force and/or involves no discretion on the officers' part. To the contrary, once the discretionary decision is made to use a dog to assist in an apprehension, the dog's handler must

---

[7] In Elwood, the Minnesota Supreme Court clarified that the federal immunity doctrine does not control state common law claims. 423 N.W.2d at 677. Thus, our review of Kuha's state claims is independent of our analysis and conclusions regarding qualified immunity.

[8] After concluding the officers' actions were discretionary, the district court found "no evidence whatsoever of malice" on the officers' part. Kuha has not challenged that aspect of the district court's ruling in his appellant briefs and we therefore decline to reach the issue.

continuously assess the evolving situation and make operational discretionary decisions–e.g., how to instruct the K-9, when to give a verbal warning, whether and when to let the dog off its leash, etc. See State v. City of Mounds View, 518 N.W.2d 567, 569-70 (Minn. 1994) ("recogniz[ing] that generally the duties of police officers call for the exercise of significant judgment and discretion"); S.L.D. v. Kranz, 498 N.W.2d 47, 50 (Minn. 1993) (recognizing, as relevant considerations in official immunity inquiry, "the nature, quality, and complexity of [the] decision-making process"); Pletan, 494 N.W.2d at 41 (noting the many factors that must be weighed in the discretionary decisions to engage in, and to continue, a high speed chase of a fleeing criminal suspect). In this case, the officers' decision to use a police dog, and the moment by moment decisions made in the course of that use, were, as a matter of law, discretionary acts, and the officers are entitled to official immunity. See Kari, 582 N.W.2d at 923 (stating that official immunity is appropriate where "an official must make instantaneous decisions often on the basis of incomplete information"); Watson, 553 N.W.2d at 415 (finding official immunity appropriate where the "situation unfolded in a manner which was far from 'fixed and designated' . . ."); Elwood, 423 N.W.2d at 679 (quoting with approval Ross v. Consumers Power Co., 363 N.W.2d 641, 679 (Mich. 1984), for proposition that "police faced with a potentially dangerous situation 'must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers.'").

Whether to extend this immunity to the City is a policy question. Pletan, 494 N.W.2d at 42. Vicarious official immunity is appropriate where the threat of liability against the governmental employer could deter the police officer from exercising his independent judgment in deciding whether, and how, to pursue a suspect in the future. S.L.D., 498 N.W.2d at 51. We agree with the district court that vicarious official immunity is appropriate in this case. Although Kuha was initially stopped for failing

to dim his lights, his behavior following that stop led the officers to reasonably believe that more might be at issue than a mere traffic infraction. See Pletan, 494 N.W.2d at 43 (refusing to fashion "a bright-line exception to vicarious official immunity in instances toward the lower end of the risk continuum" because "so many factors come into play in any [given case]"). Thus, this is not the type of reckless conduct on the officers' part which might suggest that the City should remain subject to suit. See id. (suggesting that poor judgment which rises to the level of recklessness might support a denial of vicarious official immunity); Kari, 582 N.W.2d at 925 (denial of official immunity appropriate only where "the wrongful act so unreasonably put at risk the safety and welfare of others that as a matter of law it could not be excused or justified"). Given the circumstances under which Kuha fled, and the area into which he fled, we conclude that policy considerations support extending the officers' official immunity to the City. See Pletan, 494 N.W.2d at 43 (holding that with respect to police pursuits, the police officer's official immunity extends to the officer's public employer).

III.

With respect to Kuha's § 1983 claim, we reverse the district court's judgment in favor of the City and remand for further proceedings consistent with this opinion. As to the district court's qualified immunity determination, we conclude that the law with respect to the use of police dogs was not sufficiently established that a reasonable officer would have known that the failure to give a verbal warning could be deemed unconstitutional. Finally, with respect to the state tort claims, we agree with the district court's conclusion that the individual officers are entitled to official immunity and that vicarious official immunity for the City is appropriate in this case.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT