UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

---

Jeffrey M. Kuha,

Plaintiff,

vs.

City of Minnetonka,

Defendant.

Civil Case No. 00-1683 JMR/FLN

PLAINTIFF'S STATEMENT OF CASE

---

## INTRODUCTION

This action arises from a potentially lethal wound inflicted on Plaintiff Jeffrey Kuha by a canine under the control of a Minnetonka Police officer on September 23, 1999, namely defendant Anderson.

Plaintiff originally filed suit against Defendants City of Minnetonka and Officers William Roth, Kevin Anderson and Dennis Warosh for use of excessive force in effecting his arrest under 42 U.S.C. § 1983, assault, battery and negligence in both their official and individual capacities.. Punitive damages have also been claimed against Officers Warosh, Roth and Anderson in their individual capacities.

All claims except the Monell claim against the City of Minnetonka have been dismissed. This action is before this court for a jury trial on the mandate of the Eighth Circuit in Kuha v. City of Minnetonka et. al., 365 F. 3d 590 (8th Cir, 2004), amending and substituting for the opinion

published at 328 F. 3d 427. Under the mandate, there are two issues that must be decided as the premise to Monell liability on the part of the City:

1. Did the employment of a police dog to bite and hold Jeffrey Kuha without first giving a verbal warning and opportunity to surrender to Mr. Kuha, constitute the objectively unreasonable use of force under the circumstances of Mr. Kuha's apprehension? See 365 F. 3d at 598.

2. If so, was such unreasonable use of force caused by a policy, custom or practice authorized by the City of Minnetonka to use dogs trained in the bite and hold of suspects without mandating a verbal warning in the apprehension of suspects in the same or similar circumstances to the apprehension of Mr. Kuha? See 365 F. 3d at 607.

In addition, of course, the usual findings on causation and damages will be required to render a verdict for the Plaintiff.

## FACTS

### A. Traffic Stop.

After an evening with his friends on September 22, 1999, Mr Kuha had a minor accident and damaged his car. With the aid of his friends he repaired the car for his drive home. At about 5:30AM on September 23rd, Mr. Kuha passed Officer Roth in an oncoming car. Officer Roth turned around and stopped Mr. Kuha for failing to dim his headlights. Mr Kuha's vehicle had been damaged earlier that morning, and he was in fact unable to dim his headlights without losing all headlamp illumination. Jeffrey Kuha complied and stopped his car, but then alighted from his vehicle and fled on foot in the direction of a swampy area.

Officer William Roth called for assistance. Additional squads and even a helicopter were requested. Officer Roth found Jeffrey Kuha's wallet and driver's license in the abandoned vehicle while he waited for other officers to arrive. Officer Roth also took possession of the car keys. There was no evidence of a weapon when Jeffrey Kuha left his vehicle, and no menacing gestures were made toward Officer Roth. Officer Roth did not believe that either his safety or the safety of any citizen was threatened by Jeffrey Kuha. Any sight of a weapon or aggressive behavior would have been called in by Officer Roth. Officer Roth never unholstered his weapon or otherwise attempted to accost Jeffrey Kuha physically because he did not believe the circumstances justified taking any measures that could kill or injure the suspect.

B. The K-9 attack.

Officer Roth normally would have consulted the police computer network to check the registration of Jeffrey Kuha's vehicle, but did not do so because the computers allegedly were not operating. Instead, Officer Roth contacted Lt. Terry Belfanz and reported the flight of Jeffrey Kuha to him along with information that no threat to the officer or public was apparent to Officer Roth. Belfanz dispatched a number of officers to Roth's assistance and a perimeter of armed police officers was set up around the area into which Mr. Kuha had fled.

Also, defendant Kevin Anderson and his police dog, Arco, responded. Officer Roth had requested a K-9 to assist in apprehending Mr. Kuha The request for a K-9 was monitored over the radio by Lt. Belfanz, the patrol supervisor at the scene. After arriving at the scene, Officer Anderson commanded K-9 Arco to apprehend Jeffrey Kuha. Officer Anderson knew at the time that Jeffrey Kuha did not have a weapon and that no specific threats were made to any officer. He

knew Jeffrey Kuha was pulled over for failing to dim his headlights, a minor traffic offense. When the K-9 is commanded to apprehend, he is trained to rapidly approach and grab on to any available body part presented by the suspect, a discredited police dog tactic used as a matter of policy in Minnetonka and Nazi Germany but largely discarded in the United States. In instances where it is claimed a suspect cannot be seen, Officer Anderson gives a command to his K-9 to "go get 'em" or "go bite the suspect" -- even in cases involving unarmed runaway juveniles. If Officer Anderson does not see a suspect, K-9 Arco has the go ahead to bite. Officer Kevin Anderson and K-9 Arco "apprehended" Jeffrey Kuha by biting him in the groin area, puncturing his left superficial femoral artery and causing extensive arterial bleeding.

Anderson and Arco came upon Jeffrey Kuha in a grassy opening in a wooded area. Kuha was on the ground in sitting position with his hands raised. Kuha was calling out his surrender, the end of his flight. Arco was on the end of a leash and under by his training under command to attack, bite and hold Kuha when found. Arco did attack and bite Kuha while Kuha was seated, hands in the air and asking to surrender. No warning was ever given that a K-9 was being used or would be released. No opportunity to surrender was given. No acknowledgment of Mr. Kuha's surrender was given. Kuha was looking directly at one of the pursuing officers when his hands were raised and he cried out, "I'm done." Arco attacked him seconds later. Mr. Kuha testimony on this point is found at page 52 of his deposition:

> I had seen an officer to my upper left area,
> walking. At that point, that's when I raised
> my hands up and said I was done, and it was
> probably within 5 seconds that the dog jumped
> on me at that point.

Officer Anderson and K-9 Arco were assisted by Officer Warosh. Officer Anderson and K-9 Arco tracked Jeffrey Kuha to a hill behind an apartment complex and adjacent parking lot was examined. Ultimately, K-9 Arco stood up on its hind legs and bit Jeffrey Kuha on the left leg at the hip crease -- when Jeffrey Kuha had surrendered with his hands in the air. Officer Anderson claimed to have 8-10 feet out on the K-9's lead at this time. Officer Anderson heard Mr. Kuha cry out in pain and knew the dog on his leash had clamped down on Jeffrey Kuha. Instants later he saw the dog biting and gnawing in Kuha's groin area. Jeffrey Kuha was instinctively trying to fend off the attack. K-9 Arco held on as Officer Anderson approached Jeffrey Kuha. K-9 Arco's bite had pierced Jeffrey Kuha's femoral artery and was producing copious amounts of blood.

At all times, Officer Anderson states the K-9 was under his direct control and acting as trained and ordered. The K-9 was under Officer Anderson's control when it veered up and attacked Jeffrey Kuha. At all times the K-9 was biting Jeffrey Kuha, it was under Officer Anderson's control.

Officer Anderson did not call Arco off of Kuha even though he could see the dog had bitten his suspect in a sensitive area and copious bleeding was being produced. Instead Anderson circled the besieged suspect claiming to look for a weapon. While circling he was shouting at Kuha to take his hands off the dog's head. Kuha was trying to pry the dog from his groin. As a matter of city policy, Anderson would not release the dog until Kuha stopped trying to defend himself from the dog's ongoing lethal attack. Warosh and Anderson were never threatened. No weapon was ever reported to them or brandished by the suspect. Both Officers saw that Jeffrey Kuha's hands were in open view and that he was not armed, yet both allowed the attack to continue. Jeffrey

Kuha's hands were in view trying to get the dog off. Although Officer Anderson agreed he could not have justified drawing his weapon and shooting Jeffrey Kuha or striking him with his club, he insists that allowing the K-9 to maul Jeffrey Kuha even to the point of taking his life, is justified. At any time Officer Anderson could have called the K-9 back. A one word command would have caused the K-9 to release Jeffrey Kuha.

The defendant officers admit that the continued attack was something that was deliberated upon and allowed to continue despite the obvious peril in which the attack had placed Kuha.

Finally, the hands of the spent suspect fell to his side while the dog gnawed. Anderson called Arco back. The blood was spurting out of Kuha's femoral artery. Officer Warosh applied a tourniquet. An ambulance was summoned, and Kuha was taken to Methodist Hospital for emergency surgery to seal his artery and save his life.

C. Minnetonka Policy.

Minnetonka Police Department Directives Numbers 13 and 50 govern the use of force and K-9's by officers of the Department. A Minnetonka police officer is authorized to use deadly force only under the circumstances enumerated in Directive 13.1.2. None of these circumstances apply in this case because the deployment of a police dog to bite and hold a suspect is not the use of "deadly force." See Kuha, 365 F. 3d at 598. Also the police chief in regarding "where the use of K-9 fit on the force continuum," did not regard the deployment of the police dog as deadly force. Lt. Belfanz, the patrol supervisor at the scene, candidly admits that deadly force was out of bounds under Department policy in this case. Minnetonka does have a written policy on the use of K-9 which acknowledges that using a K-9 is the use of "force," and the requires the K-9 handler to

know and apply the principles for the use of force. When using a K-9 to apprehend a suspect, an officer may only use that degree of force called for under the circumstances. Although this is the policy in the manual, the Minnetonka police chief, Joy Rikala, acknowledges that it is the apprehension of Mr. Kuha by Arco as described in the dog handler's report, i.e. a dog trained to bite and hold the suspect was deployed upon Mr. Kuha, being sought for fleeing a traffic stop. without verbal warning or an opportunity to surrender, was in accordance with City policy under the circumstances of this case. Her testimony is found, among other places, at pages 55- 56 of her deposition:

> Q. Okay. And the requirement that
> "under no circumstances," I'll quote, "Under no
> circumstances shall the dog be allowed to
>
> 56
>
> apprehend a person unless specifically authorized
> by this policy," it is your testimony that the
> bite of Kuha under these circumstances was
> specifically authorized by this policy; right?
> A. Yes.

This testimony was further underscored at page 77 when the Chief testified after stating that she had reviewed the case reports of the arresting officers, as follows:

> Q. And you found that everything that
> transpired in the apprehension of Kuha was in
> accordance with the policy of the Department?
> A. Yes.

(Emphasis supplied) The Eighth Circuit observed that this "ratification of the officers' conduct" undermined her attempt to distinguish between training and policy. Id. At p. 606.

Professor James Fyfe, Temple University, is Plaintiff's expert on policy practices and the use of force. He will iterate the operative U.S. police standards which govern in this case. In sum, Professor Fyfe's opinion is that the deployment of the K-9 to bite and hold without verbal warning was excessive force under the circumstances of this case as viewed from the ordinary practices and standards of law enforcement practice in the United States.

The testimony of Dr. Deidre Anglin will testify that law enforcement (K-9) dog bites result in both penetrating and crush injuries. She will testify in accordance with her research concerning the major complications from law enforcement K-9 bites and the effect a change in policy from the bite-and-hold and find-and-bark technique has on dog bite complications.

Based on Dr. Anglin's research, when law enforcement K-9 teams utilize the bite-and-hold technique, there is an increased probability that a suspect will be bitten and that major complications will occur. With the find-and-bark technique, the overall number of bites decreases and the number of major complications decreases.

Dr. Anglin will testify that major complications of K-9 dog bites include vascular injury, nerve injury, the need for surgical debridement, and skin grafting. The evidence will show that Jeffrey Kuha sustained all these major complications as a result of K-9 Arco's attack on September 23, 1999. In this case, Dr. Anglin will testify that the potential for lethality was high, as the bite resulted in an injury to Jeffrey Kuha's vascular structures.

E. Injuries and Damages.

The evidence will show that Jeffrey Kuha lost approximately 600 cc of blood at the scene of the incident. He was transported by ambulance to Methodist Hospital where he was under the

care of Dr. Jack Liebo. Dr. Liebo noted two deep lacerations/puncture wounds in Jeffrey Kuha's left thigh and a couple of puncture wounds on the lateral aspect of his left thigh proximally. Upon arrival to the ER, Jeffrey Kuha's leg was noted to be cold, pulseless, and he was unable to move his foot or bend his knee. Dr. Liebo determined that Jeffrey Kuha had an injury to his left neurovascular bundle (artery, vein, and femoral nerve). Jeffrey Kuha underwent emergency surgery performed by vascular surgeon, Dr. M. Mark Melin.

In surgery, Dr. Melin noted extensive tissue damage, hematoma, and ecchymosis within the tissues of Jeffrey Kuha's left groin. The proximal superficial femoral artery was noted to be clotted and bruised for a 10 centimeter length. No pulse was found in the injured artery. Dr. Melin also discovered multiple lacerations in a major branch of the superficial femoral vein and other smaller veins. The femoral nerve was found to be grossly intact. While in the operating room, Jeffrey Kuha developed a compartment syndrome (severe muscle swelling) in his left leg following repair of the femoral artery and renewed blood flow to his leg. This compartment syndrome necessitated fasciotomies. Jeffrey Kuha underwent three additional operations on his left leg from 9/23/99 to 10/4/99 for further treatment of his initial injuries, which included surgical debridement and skin grafting. Jeffrey Kuha was hospitalized for approximately three weeks.

Jeffrey Kuha sought follow-up care from Dr. Stephen Marchuk, a vascular surgeon in Hibbing. When he saw Dr. Marchuk on November 11, 1999, Jeffrey Kuha had four open areas along the incision in the left groin and the skin graft to the area of the fasciotomy. Dr. Marchuk noted significant wound drop and that Jeffrey Kuha was continuing to have pain in the affected foot. Jeffrey Kuha was reassessed by Dr. Marchuk on November 22, 1999 and his wounds were

improving. He was receiving intensive physiotherapy and home care. By January 11, 2000, Jeffrey Kuha's wounds were healed over except for a small blistered area in the groin. Movement of his left foot had somewhat improved.

Jeffrey Kuha has continuously noted pain in his leg when he attempts to run, jog, or perform any physical activity. The onset of pain occurs in his thigh and radiates down into his calf. The pain disappears with rest. Numbness and tingling in his shin and foot are daily occurrences. Dr. Marchuk noted in January 2001, that he could not feel a popliteal pulse and the dorsalis pedis pulse was only faintly palpable. In Dr. Marchuk's opinion, he was suffering from intermittent claudication in his left leg.

In Dr. Marchuk's opinion, the injuries to Jeffrey Kuha's left leg were caused by the dog bite and that the compartment syndrome in his left leg was the result of ischemia caused by the injury to the common femoral artery. According to Dr. Marchuk, without surgical intervention or dilatation, Jeffrey Kuha will have diminished blood flow to his left leg that will continue to result in claudication symptoms. Jeffrey Kuha's injuries are permanent in nature.

Jeffrey Kuha was referred for an outpatient neurological consultation due to weakness and numbness in his left leg. He had experienced footdrop and numbness suggestive of an injury beyond the distribution of the femoral nerve. Jeffrey Kuha continues to experience numbness, weakness, and pain in the left leg. The leg also tends to swell when he walks or stands for any length of time. Upon examination, Dr. Sandra Hanson noted weakness of ankle dorsiflexion, toe extension, ankle eversion, and sensory loss in the left shin, foot, and toes consistent with a peroneal nerve distribution injury. There was also an area of hypesthesia in Jeffrey Kuha's thigh and his gait

was consistent with left foot drop. An EMG study performed by Dr. Hanson demonstrated changes consistent with partial denervation of the left peroneal nerve and left femoral nerve.

In Dr. Hanson's opinion, Jeffrey Kuha sustained peroneal and femoral nerve injuries as a direct result of the September 23, 1999 incident. Jeffrey Kuha's injuries are permanent. Permanent deficits include leg pain that significantly limits Jeffrey Kuha's activities, weakness of the left ankle and toes, and continual numbness.

Jeffrey Kuha has incurred over $86,000.00 in medical expenses. Future medical care is necessary. All medical care and expense Jeffrey Kuha has received has been reasonable and made necessary as a result of the September 23, 1999 incident.

From January 1999 to September 1999, Jeffrey Kuha worked with disabled youth at St. David's Child Development and Family Services, Home-Based Services, in Minnetonka, Minnesota. He earned $ 10.00 per hour and was working approximately 30 hours per week at the time of the incident. Jeffrey Kuha missed approximately 60 weeks of work, resulting in wage loss in excess of $ 18,000.00.

Jeffrey Kuha is currently 25 years of age and has a life expectancy of 49 years. In addition to the significant medical expenses and wage loss sustained by Jeffrey Kuha, damages are claimed for the severe pain and suffering, anxiety, disfigurement, emotional distress, and loss of enjoyment of life Jeffrey Kuha has sustained and will sustain in the future as a direct result of the September 23, 1999 incident.

Plaintiff Jeffrey Kuha has also alleged punitive damages against the Defendant Officers in their individual capacities for their deliberate disregard of his rights and safety.

## ARGUMENT

THE CITY IS LIABLE UNDER 42 U.S.C. § 1983.

A municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom. Monell v. N.Y. City Dept. of Social Servs., 436 U.S. 658, 694 (1978). When the execution of the municipality's policy or custom inflicts the injury, that municipality may be held liable under § 1983. Id. A municipality is liable under § 1983 if, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. Board of Commr's v. Brown, 520 U.S. 397, 400, 404 (1997).

According to Chief Rikala, "training procedures" of the K-9s authorized the attack on Jeffrey Kuha and permits Minnetonka K-9's to "find and bite" in all cases until the "officer is certain that the suspect has no weapons and is under the direct control of the officer." The Defendant Officers, Lt. Belfanz, and Chief Rikala have all conceded in their testimony that written policy would not have justified shooting Jeffrey Kuha, beating him with a nightstick, or kicking him senseless. As the appellate court observed, Chief Rikkala took this case beyond mere training protocols when she ratified the specific conduct as authorized by City policy.

The evidence shows with unusual clarity that excessive force was employed in the apprehension of Mr. Kuha in complete conformance with City policy.

In this case, the Defendant Officers had no reason to believe that Jeffrey Kuha was armed, dangerous, that he had committed any serious crime, or that he was intending to ambush an officer. All the police knew at the time was that he fled from a routine traffic stop for failing to dim

his headlights -- a petty misdemeanor. There was no indication his car was stolen, his keys were left in the ignition, and he left behind his wallet containing a license and photo that matched him. Officer Roth found Jeffrey Kuha's wallet and keys in the ignition while he waited for other officers to arrive. Officer Roth noted that the photo and physicals matched the driver who had fled from the scene. Officer Roth did not see any weapon brandished by Jeffrey Kuha and was not threatened, nor was any nearby citizen. Jeffrey Kuha gave no indication that he was armed and dangerous. He was simply a non-violent traffic offender who left the police with his wallet and all the information the Defendant Officers needed to apprehend him later.

Officers Anderson used Arco to apprehend Jeffrey Kuha by biting and holding him without prior verbal warning. Arco severed Kuha's femoral artery . Both Officers were not under attack and saw that Jeffrey Kuha's hands were in open view and that he had no weapons, yet the attack was allowed to continue for 15 seconds or more. The K-9 was not called off because Jeffrey Kuha was trying instinctively to remove the source of the pain. Jeffrey Kuha removed his hands from the dog several times to comply with the Officers' commands, yet the K-9 was not called off. Officer Anderson was not going to remove the K-9 until Jeffrey Kuha removed his hands from its head. Officer Anderson made it clear he never has the dog release until a suspect is compliant with his commands.

Under the facts of this case, there was no imperative to apprehend Jeffrey Kuha immediately and there was no justification whatsoever for using a K-9. The reasonableness of police action is based on what officers know or have reason to believe at the time they took their actions, rather than on what they do not know or speculation about what might have been. Here,

an officer acting reasonably would have known that the use of a K-9 to forcibly apprehend Jeffrey Kuha was excessive.

LOMMEN, NELSON, COLE & STAGEBERG, P.A.

Dated: June 17, 2004

BY__s/ Phillip A. Cole______________________

Phillip A. Cole, I.D. No. 17802
Attorneys for Plaintiff
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 339-8131
FAX: (612) 339-8064

Doc. #: 107853