**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**FOURTH DIVISION**

---

**Civil Case No. 00-1683 JMR/FLN**

Jeffrey M. Kuha,

Plaintiff,

v.

City of Minnetonka,

Defendants.

**PLAINTIFF'S AMENDED DESIGNATION OF DEPOSITION TESTIMONY FOR USE AT TRIAL**

---

Plaintiff provides the following designation of deposition testimony for use at trial. Because depositions of the designated physicians have not yet occurred, a narrative summary of anticipated testimony is provided. Also Dr. Fyfe's trial availability is not certain and his trial testimony may have to be taken by video deposition.

**Dr. Deidre Anglin**: Dr. Anglin is a co-author of the Harvard study on police dog bites and their severity.

**Dr. M. Mark Melin**

A board certified vascular surgeon, Dr. Melin will testify that in the course and scope of his practice, he had the occasion to treat Plaintiff Jeffrey Kuha and will offer his opinions based upon a reasonable degree of medical certainty. Dr. Melin will testify that the injuries sustained by Jeffrey Kuha were life threatening without medical intervention. He will testify that he performed emergency surgery on Jeffrey Kuha. He will testify about his observations and findings, including but not limited to: extensive tissue damage, hematoma, and ecchymosis within the tissues of Jeffrey Kuha's left groin; the proximal superficial femoral artery was noted to be thrombosed and contused for a 10 cm length; no pulse was obtainable in the injured artery;

multiple lacerations were noted in a major branch of the superficial femoral vein and other smaller veins; and that the femoral nerve was found to be grossly intact.

Dr. Melin will testify further that Jeffrey Kuha developed compartment syndrome which necessitated fasciotomies, directly resulting from trauma to Jeffrey Kuha's upper thigh. Dr. Melin will testify that he performed three additional operations on Jeffrey Kuha's left leg for further treatment of his injuries, which included surgical debridement and skin grafting of wounds to his left proximal thigh. Dr. Melin will also testify regarding Jeffrey Kuha's ankle brachial indices and claudication in Jeffrey Kuha's left lower extremity that will continue into the future. Dr. Melin will testify that Jeffrey Kuha's treatment was reasonable and necessitated by the Sept. 23, 1999 incident and that his injuries were caused by that incident.

**Dr. Sandra K. Hanson**

A board certified neurologist, Dr. Sandra Hanson will testify that she examined Jeffrey Kuha on June 6, 2000 upon referral from Dr. M. Mark Melin for Jeffrey Kuha's continued left leg numbness and weakness. Her testimony and opinions are predicated on a reasonable degree of medical certainty. Dr. Hanson will testify that Jeffrey Kuha suffered a dog bite to his left groin in September 1999 resulting in disruption of his left superficial femoral artery and superficial femoral vein. She will testify that Jeffrey Kuha underwent construction of his left superficial femoral artery and that four compartment fasciotomies were performed of the left lower extremity with subsequent skin grafting of the left anterior compartment.

Dr. Hanson will further testify that Jeffrey Kuha has had very slowly healing wounds in his left leg and has had more distal weakness (footdrop) and numbness (anterior shin and top of the foot) suggestive of injury beyond the distribution of the femoral nerve. She will testify that

Jeffrey Kuha underwent physical therapy and showed slow improvement with regard to leg strength. She will further testify that at her December 15, 2000 visit with Jeffrey Kuha, he reported continued problems with pain in the left anterior shin and calf with increased physical activity, and that he experienced swelling in his leg when he walks or stands for any length of time. Although there was some initial improvement in strength in proximal muscles, Dr. Hanson will testify that Jeffrey Kuha continues to have residual weakness in his ankle, and continues to notice numbness in the left anterior shin and the top of the foot and medial thigh.

Pertaining to her examinations, Dr. Hanson will testify as follows: the pertinent neurological examination findings on initial visit included weakness of ankle dorsiflexion (4/5), toe extension (3/5), ankle eversion (4+/5) and sensory loss to pinprick testing in the left anterior shin and over the dorsum of the foot and toes consistent with a peroneal nerve distribution injury. There was also an area of hypesthesia in the medial thigh in an area extending from the groin down toward the knee. His gait showed a mild steppage quality consistent with left foot drop. His neurological examination on December 15, 2000 had not changed substantially for the 6 month interval in between. An EMG study performed on the same date demonstrated changes consistent with partial denervation of the left peroneal nerve and left femoral nerve.

Dr. Hanson will testify that the neurological findings and EMG findings define both a left femoral nerve and left peroneal injury that is permanent in nature. In her professional opinion, within a reasonable degree of medical certainty, permanent deficits include leg pain that significantly limits Jeffrey Kuha's activity, weakness of the left ankle and toes, and numbness. Dr. Hanson will testify that these permanent injuries were caused by direct trauma and/or vascular compromise of the nerves and that the September 23, 1999 incident was clearly a direct

cause of his injuries.

Dr. Hanson will testify that continued medical care for pain management and strengthening may be required along with continued follow-up visits. In her professional opinion, the medical care and attendant expense Jeffrey Kuha has received had been reasonable and necessary and was required by the September 23, 1999 incident.

**Dr. Stephen M. Marchuk**

A vascular surgeon in Hibbing, Minnesota, Dr. Marchuk will offer his testimony and professional opinions within a reasonable degree of medical certainty. Dr. Marchuk will testify that he originally saw Jeffrey Kuha in November of 1999 for follow-up treatment for the four open areas along the incision in Jeffrey Kuha's left groin and skin graft to the area of his fasciotomy. Dr. Marchuk will testify that Jeffrey Kuha had significant foot drop and pain at the time.

Dr. Marchuk will also testify that he reassessed Jeffrey Kuha on November 22, 1999 and at that time, his wounds were improving. Dr. Marchuk will testify that Jeffrey Kuha was started on more intensive physiotherapy and that he was examined in follow-up on January 11, 2000. Dr. Marchuk will testify that he noted that all of Jeffrey Kuha's wounds were healed except for a small area in his groin and that movement of Jeffrey Kuha's left foot was somewhat improved.

Dr. Marchuk will testify further that his last visit with Jeffrey Kuha was on January 8, 2001 and that Jeffrey Kuha reported to him with complains of pain in his thigh which would radiate down into his calf with physical activity. Dr. Marchuk will testify that Jeffrey Kuha's pain would disappear with rest and that there is still numbness in the anterior aspect of the left shin and some tingling in the foot. Dr. Marchuk will also testify that upon examination at that

time, he could feel a strong pulse in Jeffrey Kuha's left groin but could not feel a popliteal pulse and only a faintly palpable dorsalis pedis pulse. Dr. Marchuk will testify that in his opinion, Jeffrey Kuha's pulses were weaker on the left than the right and that Jeffery Kuha likely has either a stenosis or an occlusion in the common femoral artery or superficial femoral artery on the left following revascularization.

As far as causation is concerned, Dr. Marchuk will testify that the injuries to Jeffrey Kuha's left leg were caused by the September 23, 1999 dog bite and that the compartment syndrome in his lower extremity was the result of ischemia caused by the injury to the common femoral artery. Dr. Marchuk will also testify that without either surgical intervention or balloon dilatation of the effected artery, Jeffrey Kuha will continue to have diminished blood flow to the left leg that will continue to result in claudication symptoms. Dr. Marchuk will also testify that Jeffrey Kuha's medical treatment and associated expenses are reasonable and necessitated by the September 23, 1999 incident, and that without the appropriate repair, Jeffrey Kuha could have ended up with an amputation of his left leg.

**Dr. James Fyfe**: Dr. Fyfe is expected to testify as revealed in his reports.

Plaintiff also designates the January 15, 2001 deposition testimony of **Janet Ballard** for use at trial, should Ms. Ballard be unavailable for the trial of this matter.

**Chief Rikala.** In addition to being called for cross examination, the following excerpts from her deposition will be placed in evidence:

Q. Okay. And the requirement that
"under no circumstances," I'll quote, "Under no
circumstances shall the dog be allowed to

56

apprehend a person unless specifically authorized
by this policy," it is your testimony that the
bite of Kuha under these circumstances was
specifically authorized by this policy; right?

Q. And you found that everything that
transpired in the apprehension of Kuha was in
accordance with the policy of the Department?
A. Yes.

Q. Had Anderson come out of the grass
and taken a knife and slashed him in the groin,
would that have been excessive force?

101

MR. ANDREEN: Same objections.
THE WITNESS: Once again, is your --
MR. COLE: You've got my
hypothetical.
THE WITNESS: Yes, but in your
hypothetical Kuha is just sitting there?
MR. COLE: Yes.
THE WITNESS: Yes, it would be.

BY MR. COLE:

Q. Had Anderson come out of the grass, Kuha is sitting there with his hands in the air and Anderson took a knife and severed his femoral artery, would that have been excessive force?

MR. ANDREEN: Same objections.

THE WITNESS: Yes.

BY MR. COLE:

Q. Why is it not excessive force then to use the dog to do the same thing?

MR. ANDREEN: Same objections.

MR. COLE: Under Minnetonka's policies?

THE WITNESS: Once again, the K-9s are an element of use of force, they are trained to find and bite. It was appropriate in this situation. The unfortunate thing is where he

102

ended up biting.

BY MR. COLE:

Q. But you understand that the reason

he bit him there is because Kuha was seated?

A. No, I did not.

Q. So that following your review of the circumstances and your interviews of Officers Rain and Anderson, you determined that no further action was required on your part to correct or discipline the officers for the use of force in this case?

A. That is correct.

Q. And the situation has not been revisited since?

A. That is correct.

Q. And no revisions in policy have taken place?

A. That is correct.

Q. You're fully satisfied that in all of the respects of Anderson's behavior and his use of the K-9 Minnetonka's policy was carried out appropriately?

A. Yes.

LOMMEN, NELSON, COLE & STAGEBERG, P.A.

Dated: July 2, 2004

____s/Phillip A. Cole__________________

Phillip A. Cole , No. 17802
Attorneys for Plaintiff
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 339-8131
FAX: (612) 339-8064